**Nos. 23-2047 (L); 23-2049**

In the

# United States Court of Appeals
## For the Fourth Circuit

TIFFANY JOHNSON; TRACY I. CRIDER,
individually and on behalf of all others similarly situated,

*Plaintiffs-Appellees,*

v.

CONTINENTAL FINANCE COMPANY, LLC; CONTINENTAL PURCHASING, LLC,

*Defendants-Appellants,*

and

CKS PRIME INVESTMENTS, LLC,

*Defendant.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Nos. 8:22-cv-02001-PX; 8:23-cv-00854-PX

———————

**OPENING BRIEF OF APPELLANTS**

———————

Fredrick S. Levin
ORRICK, HERRINGTON &
SUTCLIFFE LLP
631 Wilshire Blvd., Suite 2-c
Santa Monica, CA 90401
T: (310) 424-3900
F: (310) 633-2800

Sarah B. Meehan
ORRICK, HERRINGTON &
SUTCLIFFE LLP
2100 Pennsylvania Ave.
Washington, DC 20037
T: (202) 349-8000
F: (202) 349-8080

*Counsel for Appellants Continental Finance Company, LLC and Continental
Purchasing, LLC*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>23-2047 (L);<br>23-2049</u>    Caption: <u>Tiffany Johnson, et al. v. Continental Finance Co., et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Continental Finance Company, LLC; Continental Purchasing, LLC</u>
(name of party/amicus)

_____

who is <u>Appellants</u>, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2. Does party/amicus have any parent corporations?  ☐ YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
   If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Matthew A. Fitzgerald    Date: 10/23/2023

Counsel for: Appellants

iii

Print to PDF for Filing

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ....................................................... II

TABLE OF CONTENTS .................................................................................... IV

TABLE OF AUTHORITIES ............................................................................... VI

INTRODUCTION ................................................................................................ 1

JURISDICTIONAL STATEMENT ...................................................................... 3

ISSUES PRESENTED .......................................................................................... 3

STATEMENT OF THE CASE .............................................................................. 4

I.      Factual Background ................................................................................. 4

II.     Procedural History and Rulings on Review ................................... 8

III.    Legal Background .................................................................................. 10

SUMMARY OF ARGUMENT .......................................................................... 11

STANDARD OF REVIEW ................................................................................ 14

ARGUMENT ....................................................................................................... 14

I.      The District Court Erred in Deciding Whether the Parties' Agreement
        Was Supported by Consideration, Rather Than Deferring to the
        Arbitrator. ............................................................................................. 14

        A.     Plaintiffs' Challenge is Solely to the Validity of the Cardholder
               Agreement As a Whole, and Therefore, Must Be Decided by
               the Arbitrator. ........................................................................... 14

        B.     The District Court Erred in Holding that It Could Entertain
               Formation Challenges, as Opposed to Challenges Based on the
               Validity of the Arbitration Agreement. .................................. 16

        C.     Plaintiffs' Challenge Is Not to the Arbitration Agreement
               Specifically, and Even if it Were, The District Court Still
               Lacked the Authority to Decide this Question of Arbitrability
               Due to the Delegation Clauses. ............................................... 18

II.     The District Court Further Erred by Disregarding the Agreement's
        Choice Of Law Provision Selecting Utah and Missouri Law. ..................... 22

        A.     The Parties Unmistakably Intended for Utah and Missouri Law
               to Apply to Their Arbitration Agreement. ............................ 22

# TABLE OF CONTENTS (Cont.)

**Page**

    B.    Neither Utah Nor Missouri Follow the *Cheek* Rule, and Therefore, Arbitration Should Have Been Compelled Under The Parties' Selected Choice of Law. ...............................................25

III.  Even Under Maryland Law, the District Court Erred in Holding the Arbitration Agreement To Be Unenforceable Under *Cheek*. .......................27

    A.    The District Court Erred in Looking Beyond the Four Corners of the Arbitration Agreement. ............................................................28

    B.    The District Court Erred in Concluding That the Entire Cardholder Agreement Lacked Adequate Consideration. .................32

CONCLUSION ...................................................................................................36

STATEMENT REQUESTING ORAL ARGUMENT ..........................................37

CERTIFICATE OF COMPLIANCE ...................................................................38

CERTIFICATE OF SERVICE ............................................................................39

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Am. Express Co. v. Italian Colors Rest.*,
  570 U.S. 228 (2013)..........................................................................10

*Amos v. Amazon Logistics, Inc.*,
  74 F.4th 591 (4th Cir. 2023) ...................................................*passim*

*Archer W. Contractors, LLC v. Synalloy Fabrication, LLC*,
  2016 WL 930965 (D. Md. 2016) .......................................................24

*Arnold v. Homeaway, Inc.*,
  890 F.3d 546 (5th Cir. 2018) .............................................................17

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011).....................................................................10, 20

*Bridgecrest Acceptance Corp. v. Donaldson*,
  648 S.W.3d 745 (Mo. 2022) ..............................................................26

*Buckeye Check Cashing, Inc. v. Cardegna*,
  546 U.S. 440 (2006)..............................................................12, 16, 18

*Cheek v. United Healthcare of Mid-Atl., Inc.*,
  378 Md. 139 (2003) ..................................................................*passim*

*Coady v. Nationwide Motor Sales Corp.*,
  32 F.4th 288 (4th Cir. 2022) ..........................................17, 29, 31, 32

*Cunningham v. Feinberg*,
  441 Md. 310 (2015) ......................................................................23, 25

*Dean Witter Reynolds Inc. v. Byrd*,
  470 U.S. 213 (1985)............................................................................11

*DIRECTV, Inc. v. Imburgia*,
  577 U.S. 47 (2015).............................................................................11

*Epic Sys. Corp. v. Lewis*,
  584 U.S. 497 (2018).....................................................................10, 20

*First Options of Chicago, Inc. v. Kaplan*,
  514 U.S. 938 (1995)........................................................................20

*Gibbs v. Haynes Invs., LLC*,
  967 F.3d 332 (4th Cir. 2020) .....................................................20, 21

*Granholm v. Heald*,
  544 U.S. 460 (2005)........................................................................35

*Harby ex rel. Brooks v. Wachovia Bank, N.A.*,
  172 Md. App. 415 (2007) ...............................................................32

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
  139 S. Ct. 524 (2019).....................................................................10

*Hill v. PeopleSoft USA, Inc.*,
  412 F.3d 540 (4th Cir. 2005) ....................................................*passim*

*Hillbery v. Nu Skin Enterprises U.S., Inc.*,
  2022 WL 219560 (D. Utah 2022)...................................................26

*Holloman v. Circuit City Stores, Inc.*,
  391 Md. 580 (2006) .........................................................32, 33, 34

*Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*,
  379 F.3d 159 (5th Cir. 2004) .........................................................35

*In re Cox Enters., Inc. Set-top Cable Television Box Antitrust Litig.*,
  835 F.3d 1195 (10th Cir. 2016) ......................................................15

*In re StockX Customer Data Sec. Breach Litig.*,
  19 F.4th 873 (6th Cir. 2021) ..........................................................19

*Jackson v. Pasadena Receivables, Inc.*,
  398 Md. 611 (2007) ..................................................................23, 25

*James v. Synovus Bank*,
  2020 WL 1479115 (D. Md. 2020)..................................................24

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
  313 U.S. 487 (1941)........................................................................23

*Kronovet v. Lipchin*,
  288 Md. 30 (1980) .............................................................23

*Lamps Plus, Inc. v. Varela*,
  587 U.S. 176 (2019)...........................................................10

*MacDonald v. CashCall, Inc.*,
  883 F.3d 220 (3d Cir. 2018) ...............................................21

*Mbongo v. Robinhood Markets, Inc.*,
  2022 WL 621797 (Md. Ct. Spec. App. Mar. 3, 2022)...........32

*Nat'l Glass, Inc. v. J.C. Penney Properties, Inc.*,
  336 Md. 606 (1994) ...........................................................23

*Noohi v. Toll Bros.*,
  708 F.3d 599 (4th Cir. 2013) .........................14, 17, 28, 29

*Porter Hayden Co. v. Century Indem. Co.*,
  136 F.3d 380 (4th Cir. 1998) .............................................11

*Preston v. Ferrer*,
  552 U.S. 346 (2008)......................................................11, 16

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
  388 U.S. 395 (1967)...........................................................12

*Questar Builders, Inc. v. CB Flooring, LLC*,
  410 Md. 241 (2009) ...........................................................35

*Rent-A-Center, W., Inc. v. Jackson*,
  561 U.S. 63 (2010).............................................................16

*Rota-McLarty v. Santander Consumer USA, Inc.*,
  700 F.3d 690 (4th Cir. 2012) .............................................34

*Simply Wireless, Inc. v. T-Mobile US, Inc.*,
  877 F.3d 522 (4th Cir. 2017) .............................................19

*Skinker v. State*,
  239 Md. 234 (1965) ...........................................................35

**Statutes**

9 U.S.C. § 2 .................................................................................*passim*

9 U.S.C. § 3 ................................................................................3

9 U.S.C. § 4 ................................................................................3

9 U.S.C. § 16 ...............................................................................3

28 U.S.C. § 1332 ..........................................................................3, 9

**Other Authorities**

AAA, Consumer Arb. R. 14(a),
  https://www.adr.org/sites/default/files/Consumer-Rules-
  Web_0.pdf;.............................................................................19

*Law,* Black's Law Dictionary (11th ed. 2019) .......................................33

## INTRODUCTION

The court below refused to enforce the parties' agreement to arbitrate this dispute, because it concluded that, under Maryland law, the broader contract in which the Arbitration Agreement was contained lacked "sufficient consideration" due to Appellants Continental Finance Company, LLC and Continental Purchasing, LLC's ability to modify certain terms "upon such notice . . . as is required by law." JA514-520. That conclusion was error for at least four independent reasons.

*First*, the District Court lacked the power to decide whether the parties' agreement was supported by adequate consideration. The Arbitration Agreement stated expressly that the parties must arbitrate any dispute that "arises out of . . . the Agreement"—including "any Claim arising out of or in any way relating to the [Arbitration] Provision itself," as well as "[a]ll issues of arbitrability." JA136. Accordingly, the District Court was bound to defer to the arbitrator—rather than to decide for itself—any question of whether the agreement was supported by adequate consideration.

*Second*, the District Court erred again by applying Maryland law to that question of consideration, which it should not have kept. The Arbitration Agreement expressly incorporated a choice-of-law provision, which in turn stated that Utah and Missouri law shall govern any disputes brought under the broader contract, including those by Appellants and by Plaintiff-Appellees Tiffany Johnson and Tracy Crider

1

(collectively, "Plaintiffs" or "Johnson" and "Crider").  The District Court, however, refused to give effect to that provision—opting instead to apply an unusual Maryland precedent (which neither Utah nor Missouri follow) to determine the adequacy of the parties' consideration.

*Finally*, the District Court erred twice more in its application of Maryland law. The court below held that the Arbitration Agreement here was invalid under a case called *Cheek v. United Healthcare of Mid-Atl., Inc.*, 378 Md. 139 (2003), in which the Maryland Court of Appeals held that an arbitration provision is severable from any larger contract in which it appears and must be supported by independent consideration (most commonly, a mutual agreement to arbitrate claims).  As this Court has made clear, however, that rule of severability necessarily means that courts must consider only the terms of the arbitration agreement itself and are "not allowed" to look beyond its four corners "to determine whether the agreement was supported by consideration." *Hill v. PeopleSoft USA, Inc.,* 412 F.3d 540, 543 (4th Cir. 2005). The District Court, however, did just that, finding inadequate consideration based on evidence that it admitted lay outside of the Arbitration Agreement's terms.  What is more, the only reason the District Court found the consideration to be inadequate is because it understood a contractual term that allowed Continental to make changes only "upon such notice . . . as is required by law," as requiring no notice from Continental at all.  JA517.

The District Court's decision is exactly the type that Congress enacted the Federal Arbitration Act ("FAA") to prevent. At every step, the court below overreached to keep this case out of arbitration. Its decision calls for reversal.

## JURISDICTIONAL STATEMENT

The District Court had diversity jurisdiction under 28 U.S.C. § 1332 because the named plaintiffs, Tiffany Johnson and Tracey Crider, are citizens of different states than the respective defendants, and the amount in controversy exceeds $75,000. The District Court also had jurisdiction under the Class Action Fairness Act ("CAFA") because both suits are class actions consisting of more than 100 putative class members; the citizenship of at least one plaintiff is different from that of at least one defendant; and the matter in controversy exceeds $5 million. *See* 28 U.S.C. § 1332(d). This Court has appellate jurisdiction under 9 U.S.C. § 16(a)(1)(A)–(B) because this is an appeal of an order denying a petition to compel arbitration and stay proceedings under 9 U.S.C. §§ 3–4.

## ISSUES PRESENTED

I.    Whether the District Court erred in denying Continental's motion to compel arbitration under 9 U.S.C. § 4 of the FAA where it found that a challenge to the validity of the cardholder agreement as a whole—as opposed to the validity of the embedded arbitration agreement—rendered it appropriate for resolution by the court, despite the existence of two separate delegation clauses.

II.    Whether the District Court erred in refusing to enforce the parties' choice-of-law clause—requiring the application of Utah and Missouri law, which differs fundamentally from Maryland law on the issue of whether separate consideration is required to support an embedded arbitration agreement located within a broader contract—and in applying Maryland law instead to determine whether the parties' Arbitration Agreement was supported by consideration on the basis of two federal district court cases that did not cite to nor apply Maryland law concerning choice of law principles.

III.    Whether the District Court erred in finding that the parties' Arbitration Agreement—located within a broader underlying contract—lacked adequate consideration for containing illusory promises to arbitrate due to a change-in-terms clause that was located outside of the four corners of the Arbitration Agreement and that required notice to be provided to consumers "as is required by law."

## STATEMENT OF THE CASE

### I.    Factual Background

In 2019, Tracey Crider opened a Fit® Mastercard® credit card account issued by The Bank of Missouri ("TBOM").  JA392-393 ¶ 5, JA397.  In 2021, Tiffany Johnson opened a Surge® Mastercard® credit card account issued by Celtic Bank.

4

JA117 ¶ 8, JA152.  Continental serviced Crider's account for TBOM and Johnson's account for Celtic Bank.[1]  JA392 ¶ 4, JA409, JA116-117 ¶¶ 3, 8, JA162.

Under the terms of the cardholder agreement ("Cardholder Agreement") governing Crider's and Johnson's credit card accounts, a cardholder could accept the cardholder agreement by using their accounts.  JA117 ¶¶ 10-12, JA393 ¶¶ 10-11, *see also* JA162 ("By accepting and using the Card, . . . you expressly agree to be bound by the provisions of this Agreement[.]").[2]  JA117 ¶¶ 8-9, JA162, JA393 ¶¶ 8-9, JA409.  On December 9, 2019, Crider activated her TBOM-issued credit card, and began making purchases with the card the same day.  JA393 ¶ 11.  Likewise, on February 23, 2021, Johnson activated her Celtic Bank-issued credit card, and began making purchases with the card on or about March 12, 2021.  JA117 ¶ 11.  Crider and Johnson[3] also do not dispute that they accepted the terms of the Cardholder Agreement.  Both concede they "accepted and used [their] Continental credit card[s]."[4]  JA182, JA436; *see also* JA289 ¶ 139, JA47 ¶ 126.

---

[1] This brief refers to Appellants Continental Finance Company, LLC and its wholly-owned subsidiary Continental Purchasing, LLC collectively as "Continental" or "Appellants."

[2] Crider's and Johnson's Cardholder Agreements contain the same relevant language, so Continental refers to a single Cardholder Agreement and cites the agreement filed in *Johnson*, as the District Court did.  JA508 n.2.

[3] This brief refers to Appellees Crider and Johnson collectively as "Crider and Johnson" or "Plaintiffs."

[4] Crider and Johnson argued below that their "acceptance and use of the Card" occurred in Maryland and admit they made payments on their accounts.  JA445,

The *first* section of the Cardholder Agreement,[5] under the heading "YOUR AGREEMENT WITH US," includes the following provisions:

**Applicable Law**.  This Agreement and your Account, and any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or related to your Account, this Agreement or any transferred balances, are governed by and construed in accordance with applicable federal law and, to the extent not preempted by federal law, by the laws of [Utah (Johnson) and Missouri (Crider)] (without applying its choice-of-law rules) "(Applicable Law")".  The formation, legality, enforceability, and interpretation of this Agreement, and any amounts contracted for, charged and received under this Agreement, will be governed by such laws.

**Changes in Agreement Terms**.  We can change any term of this Agreement, including the rate at which or manner in which INTEREST CHARGES, Fees, and Other Charges are calculated, in our sole discretion, upon such notice to you as is required by law.  At our option, any change will apply both to your new activity and to your outstanding balance when the change is effective as permitted by law.[6]  (The "change-in-terms clause.")

---

JA192, JA289 ¶ 139, JA47 ¶¶ 126, 130 (Johnson).  Johnson's account is still open and enrolled in automatic payments.  JA246 ¶ 6-7.

[5] As the underlying motions to compel make clear, the Cardholder Agreements were updated in 2022 and therefore, Continental provided both the 2020 and the 2022 versions of the Cardholder Agreements in the underlying motions to compel. Plaintiffs' oppositions cited to both versions of the agreements.  Because the District Court concluded that the 2022 version was the operative version and therefore, cited exclusively to the 2022 version, this brief does the same.

[6] The Cardholder Agreement uses the term "we" to refer to the issuing bank "as the issuer of the Card" and to Continental "as servicer."  JA162.  Although not relevant to the arbitration questions presented here now, the issuer and the servicer have very different roles, both in practice and as defined by the contracts setting forth the relationship with each other and their respective responsibilities with respect to the credit cards.  Nothing in this brief should be interpreted as conflating the role of the issuer banks (Celtic Bank and TBOM) with the role of the servicer, Continental.

**Severability.** If any provision of this Agreement, including any portion of the Arbitration Provisions set forth below, is determined to be invalid or unenforceable under any rule, law, or regulation, the validity or enforceability of any other provision of this Agreement shall not be affected, and in lieu of such invalid or unenforceable provision there shall be added automatically, as part of this Agreement, a provision as similar in terms as may be valid and enforceable, if possible . . . .

JA163.

The *final* section of the Cardholder Agreement—located nearly sixty-two paragraphs after the Change Clause in a separately labeled heading—contains the terms of an agreement to arbitrate ("Arbitration Agreement"), including a class action waiver, under the heading "ARBITRATION PROVISION." JA170-171. Among other things, the provision includes:

**A right to opt-out of the Arbitration Provision**:

Unless you opt out of this Provision in the manner set forth below in subpart (p), any claim that arises out of or in any way relates to the Agreement, your Account, or this Provision (the "Claim(s)") shall be resolved exclusively by binding bilateral arbitration[.]

**Two clauses delegating issues of arbitrability to an arbitrator**:

Arbitration in accordance with this Provision shall be conducted by the American Arbitration Association ("AAA") by a single arbitrator (the "Arbitrator") using the applicable rules and procedures established by the AAA for expedited consumer arbitration.

The Provision covers any Claim arising out of or in any way relating to the Provision itself. All issues of arbitrability must be arbitrated, including but not limited to whether the Provision is enforceable or applicable. (The "delegation clause.")

**A severability clause**:

7

If any part of the Provision is found unenforceable, subject to any rights to judicial and/or appellate review, the offending part shall be severed and the balance of the Provision shall remain in effect and shall be construed in light of the express intent of you and us to resolve all claims on a bilateral basis in binding arbitration,

**Cross-references to the Applicable Law provision**:

The Arbitrator shall enforce the Applicable Law in the Agreement. . .

If permitted by Applicable Law, the Arbitrator may award reasonable attorney's fees and costs to the party who substantially prevails in arbitration.

**Identification of Continental as an intended beneficiary of the arbitration provision**:

Each of the following persons or entities is an intended beneficiary of the Provision and may enforce the Provision in full with respect to any claims between such persons or entities on the one hand and you on the other hand that arise out of or in any way relate to the Agreement or the Provision: Continental Finance. . .

JA170-171. Notably, the Arbitration Agreement does not reference the change-in-terms clause from the first section of the Cardholder Agreement. Neither Crider nor Johnson assert they opted out of the Arbitration Agreement. *See generally* JA172 (Johnson), JA426 (Crider), JA394 ¶ 14.

## II.    Procedural History and Rulings on Review

Crider and Johnson separately sued Continental in Maryland state court, alleging that Continental made loans to them and a putative class without the required licensing and seeking the return of payments they claim they made to

8

Continental.  JA24, JA261.  Despite the Cardholder Agreement identifying the applicable banks as the card issuers, Crider and Johnson allege that Continental "extended credit to" and "collected all payments" from them.  JA266 ¶ 17, JA272-273 ¶ 55, JA26-27 ¶ 13, JA37 ¶ 69 (Johnson).  Continental removed both cases to federal court under diversity and CAFA jurisdiction (JA10, JA247) and moved to compel arbitration in each case under the Arbitration Agreement in the Cardholder Agreement.  JA102, JA367.  The district court ("District Court") consolidated the two cases.  JA506.

Upon considering the motions to compel, the District Court denied them, finding that the change-in-terms clause in the first section of the Cardholder Agreement functioned to give Continental "unfettered and unilateral power" with respect to the terms of the Arbitration Provision in the final section of the Cardholder Agreement.  JA515, JA520.  Based on this finding, the District Court held that the parties never formed an enforceable agreement to arbitrate, reasoning that it could not "ignore the plain reading of the 'contract as a whole'" and that the combination of the change-in-terms clause and Arbitration Provision within the same Cardholder Agreement was analogous to the arbitration provision in *Cheek* "in all material respects," rendering the Arbitration Provision "illusory" under Maryland law.  JA515-516.  Continental timely appealed.  JA606, JA609.  This Court consolidated Continental's appeals as to Johnson and Crider.

## III.    Legal Background

Under the FAA, written agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Congress passed the FAA "in response to widespread judicial hostility to arbitration."  *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 232 (2013).  It "directed courts to abandon their hostility and instead treat arbitration agreements as 'valid, irrevocable, and enforceable.'"  *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 505 (2018) (quoting 9 U.S.C. § 2).  The FAA thus "requires courts 'rigorously' to 'enforce arbitration agreements according to their terms, including terms that specify with whom the parties choose to arbitrate their disputes and the rules under which that arbitration will be conducted.'"  *Id.* at 506 (quoting, with modification, *Am. Express*, 570 U.S. at 233); *see also Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019).  "The overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011); *see also Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 185 (2019) ("benefits of private dispute resolution [include] lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes" (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 685 (2010)).

The FAA is mandatory and does not allow courts to delve into policy considerations regarding arbitration. It "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985). As the Supreme Court has repeatedly emphasized, this "national policy favoring arbitration" supersedes "state [law] attempts to undercut the enforceability of arbitration agreements." *Preston v. Ferrer*, 552 U.S. 346, 353 (2008); *see also DIRECTV, Inc. v. Imburgia*, 577 U.S. 47, 48 (2015) (invalidating California Court of Appeal's interpretation of arbitration clause that would "not place arbitration contracts 'on equal footing with all other contracts'"). Although Utah and Missouri law supplies the applicable contract formation principles here, federal law under the FAA governs arbitration issues. *See Porter Hayden Co. v. Century Indem. Co.,* 136 F.3d 380, 393 (4th Cir. 1998); JA410, JA509 (the Cardholder Agreement is governed by "applicable federal law and, to the extent not preempted by federal law, by the laws of [Utah in *Johnson* and Missouri in *Crider*]").

## SUMMARY OF ARGUMENT

The District Court improperly refused to compel multiple questions of arbitrability to the arbitrator, and instead decided a number of issues that had been delegated to the arbitrator under controlling Supreme Court and Fourth Circuit Law.

11

In doing so, the District Court viewed Plaintiffs' challenge to the entirety of the Cardholder Agreements as a challenge to the embedded Arbitration Agreement and two delegation clauses specifically and as a question of formation, and applied Maryland law—despite the parties' agreement for Utah and Missouri law to apply to substantive questions not addressed under the FAA. Under these erroneous holdings, the District Court went on to find Continental's promise to make changes to the Cardholder Agreement only "upon such notice to you as is required by law" rendered the embedded Arbitration Agreement illusory. JA518. The District Court's decision should be reversed for four independent reasons.

First, the District Court should not have decided Appellees' challenge in the first place because Plaintiffs' challenge was to the validity of the Cardholder Agreement as a whole, instead of a specific challenge to the Arbitration Agreement or its two express delegation clauses. Such a challenge, under controlling Fourth Circuit and Supreme Court guidance *Prima Paint* and *Buckeye*, presents an issue for an arbitrator, not the District Court. *See Amos v. Amazon Logistics, Inc.*, 74 F.4th 591, 595 n.4 (4th Cir. 2023); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1, 448–49 (2006).

Second, the District Court erred in refusing to enforce the parties' choice-of-law clause, which provided for the application of Utah and Missouri state law to any

disputes arising out of the Cardholder Agreement.  The District Court's refusal to enforce the parties' selected choice of law was a significant departure from Maryland law, which requires enforcement of choice-of-law clauses (even when addressing the issue of whether a contract has been formed).

Third, even assuming that Maryland law applies (and it did not) and the District Court was permitted to resolve the issue instead of an arbitrator (and it was not), the District Court improperly looked outside the four corners of the Arbitration Agreement in finding that a separate change-in-terms clause rendered Continental's promises to arbitrate illusory.  For that reason, the *Cheek* rule was inapplicable.  Even if the *Cheek* rule were applicable to the Arbitration Agreement located within the broader Cardholder Agreement, the District Court's interpretation of the limitations on Continental's ability to modify the Arbitration Agreement "upon such notice to you as is required by law," is divorced from the plain meaning of the phrase and violates established principles of contract interpretation.  The only reading that gives effect to all of the language in the Cardholder Agreement is that Continental was limited in its ability to modify the Arbitration Agreement only upon such advance written notice, as dictated by Maryland decisional law.  This binding promise provides the consideration that Maryland law requires to make the Arbitration Agreement enforceable.

For any of these reasons, the District Court's decision should be reversed.

13

**STANDARD OF REVIEW**

This Court reviews de novo a district court's determination of arbitrability, giving due regard to federal policy favoring arbitration. *Noohi v. Toll Bros.*, 708 F.3d 599, 605 (4th Cir. 2013).

**ARGUMENT**

**I.    The District Court Erred in Deciding Whether the Parties' Agreement Was Supported by Consideration, Rather Than Deferring to the Arbitrator.**

The District Court refused to compel arbitration because it concluded that the broader Cardholder Agreement, in which the Arbitration Agreement was embedded, lacked "sufficient consideration," due to Continental's ability to modify certain terms. JA515.  That question, however, was not the District Court's to decide.  The Arbitration Agreement stated expressly that the parties must arbitrate any dispute that "arises out of . . . the Agreement"—including "any Claim arising out of or in any way relating to the [Arbitration] Provision itself," as well as "[a]ll issues of arbitrability."  JA170, JA417.  Under the FAA, the District Court was bound to respect the delegation, and to thus defer the question of this dispute's arbitrability to the arbitrator.  Because the District Court did not, its decision must be reversed.

**A.    Plaintiffs' Challenge is Solely to the Validity of the Cardholder Agreement As a Whole, and Therefore, Must Be Decided by the Arbitrator.**

As this Court has recently held, a contention (like Plaintiffs' here) that an "arbitration clause [is] 'illusory,'" due to a defendant's "unilateral ability to modify

14

certain portions of the Agreement," is "precisely the sort of argument that . . . must be deferred for arbitration." *Amos v. Amazon Logistics, Inc.*, 74 F.4th at 595 n.4. That is because, a provision requiring arbitration of disputes arising under a contract necessarily requires that "contract-validity contentions going to the contract as a whole must be deferred for consideration during arbitration by the arbitrator." *Id.*[7] And an argument that the Cardholder Agreement containing the Arbitration Agreement "failed at the contract formation stage" for lack of consideration is one that goes to the validity of the "contract as a whole," since if the entire Cardholder Agreement lacked consideration, then the entire Cardholder Agreement is invalid. *Id.*; *accord, e.g.*, *In re Cox Enters., Inc. Set-top Cable Television Box Antitrust Litig.*, 835 F.3d 1195, 1211-12 (10th Cir. 2016) (challenge based upon change of terms clause located within broader contract in which arbitration provision was located "can prevail only as an attack on the [] agreement as a whole" and thus "must be resolved by the arbitrator").

---

[7] Importantly, this is true even if the Arbitration Agreement does not state that issues of arbitrability are to be decided by the arbitrator. Indeed, as *Amos* explained, even where "challenges made explicitly to the arbitration provision may be considered by the court," challenges to the validity of "the contract as a whole"—including the challenge to "formation," discussed in text above—must still be reserved for the arbitrator. *Amos*, 74 F.4th at 595 n.4. That is because such a challenge is not one of arbitrability, but rather a question arising under the contract itself. Accordingly, it remains for an arbitrator regardless of to whom the contract delegates authority to decide arbitrability questions. *See id.*

That holding flows directly from Supreme Court's admonition that where, as here, an arbitration provision specifies that the parties will "arbitrate all disputes arising under their contract, questions concerning the validity of the entire contract are to be resolved by the arbitrator in the first instance, not by a federal or state court." *Preston v. Ferrer*, 552 U.S. at 349; *see also* JA170, JA417 (Arbitration Agreement requiring parties to arbitrate any dispute that "arises out of . . . the Agreement"). After all, a dispute about whether a contract is valid at all *is* a "controversy arising out of [that] contract." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. at 447. Accordingly, "a party's challenge . . . to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010).

Under settled precedent, then, the question of whether the Cardholder Agreement was supported by adequate consideration should have been decided by the arbitrator. Because the District Court ran afoul of that well-established rule, its decision must be reversed.

**B.** **The District Court Erred in Holding that It Could Entertain Formation Challenges, as Opposed to Challenges Based on the Validity of the Arbitration Agreement.**

The District Court nevertheless concluded that it was free to decide the issue itself, because Plaintiffs' challenge went to "contract *formation*" not "contract *validity*." JA512-513 (emphasis in original). Specifically, the District Court

16

reasoned that its obligation to defer questions to the arbitrator extended only to "[a] challenge to an agreement's validity"—not to a question about "whether the contract had been validly formed." JA513. According to the District Court, Plaintiffs' challenge fell into the latter category—because it maintained that "the parties never formed an agreement"—and thus it "plainly stay[ed] with the Court." JA513-514.

But that reasoning runs headlong into the caselaw just discussed. Indeed, as noted above, the plaintiffs in *Amos*—just like Plaintiffs here—contended that their agreement to arbitrate was "illusory" and thus failed at the "contract *formation* stage" because the defendant had reserved a "unilateral ability to modify certain portions of the [a]greement." *Compare Amos*, 74 F.4th at 595 n.4 (emphasis added), *with* JA514 ("Plaintiffs contend that the Change Clause renders the parties' agreement to arbitrate all disputes illusory."). Nevertheless, this Court had no trouble concluding that such an argument was "precisely the sort of argument that . . . must be deferred for arbitration." *Amos*, 74 F.4th at 595.[8]

---

[8] Indeed, as *Amos* itself illustrates, questions about contract formation are (just like questions about validity) reserved for the arbitrator. But even if one thought that formation-versus-validity were a meaningful distinction, numerous courts have made clear that a challenge to the adequacy of consideration is a question of the contract's validity (sometimes called "enforceability"). *See, e.g., Arnold v. Homeaway, Inc.*, 890 F.3d 546, 550–51 (5th Cir. 2018) ("allegation that a particular provision of the contract is illusory is properly considered a validity challenge rather than a formation challenge"); *Coady v. Nationwide Motor Sales Corp.*, 32 F.4th 288, 293 (4th Cir. 2022) (question of consideration went to whether contract was "unenforceable"); *Noohi*, 708 F.3d at 605 (same).

The Supreme Court, too, has rejected the District Court's contention that the requirement to defer an issue to the arbitrator "presupposes that the parties had formed a binding arbitration agreement." JA512-513. As explained in *Buckeye*, the FAA itself contemplates that a court may "enforce an arbitration agreement in a contract that the arbitrator later finds to be void." 546 U.S. at 448-49. That is because Congress preferred that outcome to one in which a district court would "deny effect to an arbitration provision in a contract that the court later finds to be perfectly enforceable." *Id.* In other words, as between a regime that sent too many cases to arbitration, versus one that kept too many cases in federal and state courts, Congress "resolved this conundrum" in favor of the former. *Id.*

Accordingly, even on its own terms, the District Court's decision squarely contravenes cases like *Amos* and *Buckeye*. It must be reversed.

**C.    Plaintiffs' Challenge Is Not to the Arbitration Agreement Specifically, and Even if it Were, The District Court Still Lacked the Authority to Decide this Question of Arbitrability Due to the Delegation Clauses.**

Nor can the District Court's decision be saved by the District Court's in-passing suggestion that Plaintiffs' challenge might be construed as "a direct challenge solely to the formation of the Arbitration Provision," as opposed to a "broader attack on the formation of the Agreement within which the Arbitration Provision sits." JA514 (declining to decide this question). As noted above, *Amos* squarely holds that Plaintiffs' challenge is the latter. *See* 74 F.4th at 595 n.4

(argument that "arbitration clause [is] 'illusory,'" due to a defendant's "unilateral ability to modify certain portions of the Agreement," is a "contention[] going to the contract as a whole must be deferred for consideration during arbitration by the arbitrator"); *see also, e.g.*, *In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873, 886–87 (6th Cir. 2021) (challenge to change-in-terms provision was challenge to entire contract, reserved for the arbitrator, because there was no way in which the "provision operate[d] on the [arbitration] provision any differently than it operate[d] on other provisions").

But even if Plaintiffs' challenge concerned only the Arbitration Agreement, it would still be reserved for the arbitrator. That is because the Arbitration Agreement here contains two delegation provisions: (1) a clause that expressly states that issues of arbitrability are to be decided by the arbitrator (JA174, JA460) ("All issues of arbitrability must be arbitrated."); and (2) a clause expressly incorporating the Consumer Arbitration Rules of the American Arbitration Association, which require delegation of all issues relating to the "existence, scope, or validity of the arbitration agreement" (JA170, JA417); AAA, Consumer Arb. R. 14(a), https://www.adr.org/sites/default/files/Consumer-Rules-Web_0.pdf; *Simply Wireless, Inc. v. T-Mobile US, Inc.,* 877 F.3d 522, 528-29 (4th Cir. 2017) (incorporation of JAMS rules serves as "clear and unmistakable evidence of the

parties' intent to arbitrate arbitrability" and relying on cases incorporating AAA rules).

As the Supreme Court has explained, this kind of provision displaces the usual regime in which courts decide whether a dispute is arbitrable, and instead requires them to "defer to an arbitrator's arbitrability decision." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). After all, the entire purpose of the FAA is to "require[] courts rigorously to enforce arbitration agreements according to their terms, including terms that specify with whom the parties choose to arbitrate their disputes and the rules under which that arbitration will be conducted." *Epic Sys.*, 584 U.S. at  S. Ct. at 505; *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. at 344 ("The overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceeding."). And so where (as here) an agreement states that arbitrability is to be decided by the arbitrator, then a court may not (as the District Court did here) decide that question itself.

To be sure, "if the claimant specifically attacks the validity of the delegation clause itself, a court may consider that clause's enforceability." *Gibbs v. Haynes Invs., LLC*, 967 F.3d 332, 337 (4th Cir. 2020). But as this Court has emphasized, the circumstances under which that review is allowed are exceptionally limited. *Id.* When an arbitration agreement contains a delegation clause, a court (as opposed to

20

an arbitrator) may decide a plaintiff's argument only if she "specifically challenged the enforceability of the delegation provision." *Id.* at 338. That in turn requires the plaintiff to attack "the delegation provision" specifically—as opposed to the arbitration provision generally—"in his opposition to the motion to compel arbitration." *Id.*; *see also MacDonald v. CashCall, Inc.*, 883 F.3d 220, 226 (3d Cir. 2018). As this Court recently put it: "[U]nless the plaintiff has 'challenged the delegation provision specifically, [a court] must treat it as valid.'" *Gibbs*, 967 F.3d at 337 (quoting *Rent-A-Center*, 561 U.S. at 72).

Here, there is no dispute that Appellees have done no such thing. While Appellees litter in references to the delegation clause throughout their opposition, they do not, in fact, challenge the delegation clause in substance, only in name. *See* JA186, JA478 (citing legal authority stating that it is merely sufficient to "at least reference the delegation provision" in an opposition). And even the District Court was not willing to construe their arguments as a challenge to the delegation provision in particular. To the contrary, the narrowest possibility that the District Court was even conceivably willing to entertain is that Plaintiffs' challenge might have been to the "formation of the Arbitration Provision" as a whole; it (rightly) never suggested that Plaintiffs had attacked the delegation provision in particular. JA514. Indeed, the only reason that the District Court itself gave for why the delegation provisions would be unenforceable was that "the parties never formed an agreement to

21

arbitrate" in the first place.  JA513.  In other words, the District Court's analysis too—just like Plaintiffs'—was, at its narrowest, focused on the Arbitration Agreement generally, not the delegation clause specifically.

\*      \*      \*

The District Court thus erred—for multiple reasons—in deciding whether this dispute should be arbitrated.  Under *Amos*, the type of challenge that Plaintiffs bring here is plainly one to the entire Cardholder Agreement, and so is reserved for the arbitrator.  What is more, and in any event, because the Arbitration Agreement contains a delegation clause, the District Court was bound to submit the entire dispute to arbitration unless Plaintiffs mounted a challenge specifically to the delegation provisions.  There is no dispute that they have failed to do so.  Because the District Court failed to defer to the arbitrator, its decision must be reversed.

## II.    The District Court Further Erred by Disregarding the Agreement's Choice Of Law Provision Selecting Utah and Missouri Law.

### A.    The Parties Unmistakably Intended for Utah and Missouri Law to Apply to Their Arbitration Agreement.

The decision below is further flawed, because even if the District Court had properly been able to consider the Arbitration Agreement's formation it did so under the wrong law.  All agree that "the Arbitration Provision incorporates [the broader Agreement's] choice-of-law[] provision," which in turn specifies that "Utah and Missouri law respectively" apply to the "*formation*, legality, *enforceability*, and

interpretation" of each Appellee's Agreement. JA511-512 (emphasis added). Under Maryland choice-of-law rules, *see Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (federal court sitting in diversity applies choice of law rules of state in which it sits), that specification should have governed: "[I]f [a] contract contains a choice of law provision, [Maryland courts] apply generally the law of the specified jurisdiction." *Cunningham v. Feinberg*, 441 Md. 310, 325-26 (2015).[9]

Importantly, the Maryland Court of Appeals has made clear that that general rule applies with full force where (as here) there is a "dispute over the validity, construction, or enforceability of the contract" itself. *Jackson v. Pasadena Receivables, Inc.*, 398 Md. 611, 617 (2007) (applying provision selecting South Dakota law when considering challenge to formation of contract based on lack of party's signature); *see also Kronovet v. Lipchin*, 288 Md. 30, 43 (1980) ("[T]he parties to a contract may agree as to the law which will govern their transactions, even as to issues going to the validity of the contract.").

---

[9] The only exceptions to that rule are if: "(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties." *Nat'l Glass, Inc. v. J.C. Penney Properties, Inc.*, 336 Md. 606, 610–11 (1994). Neither Appellees nor the District Court have suggested that either of those exceptions is applicable here. *See* JA183-186, JA437-440, JA507.

The District Court, however, refused to abide by the Cardholder Agreement's choice-of-law provision.[10]  Although it recognized that "generally, the Court must honor the parties' agreement to apply selected substantive state law," the District Court thought that there was an exception to that rule when a party disputes whether an "agreement is binding in the first instance." JA512.  But as explained just above, no such exception exists—and Maryland courts continue to adhere to choice-of-law provisions in exactly this circumstance.

Perhaps unsurprisingly, the District Court cited no Maryland state law in support of its reasoning.  Instead, it relied on two federal district court cases—both of which expressly declined to reach this issue, and neither of which cited any Maryland authorities on this point.  *See James v. Synovus Bank*, 2020 WL 1479115, at *2 (D. Md. 2020) ("The Court need not resolve which state's law applies to the contract formation question, as the answer to whether the parties agreed to arbitrate this dispute is the same [regardless].") (citing *John T. Jones Constr. Co. v. Hoot Gen. Constr. Co.,* 613 F.3d 778 (8th Cir. 2010) and *NuCap Indus., Inc. v. Robert Bosch LLC,* 273 F. Supp. 3d 986 (N.D. Ill. 2017)); *Archer W. Contractors, LLC v. Synalloy*

---

[10] Not only was the choice-of-law provision made explicitly clear in the Cardholder Agreement, but both Plaintiffs acknowledged and accepted the same choice-of-law when submitting their online applications for the subject credit cards.  JA122, JA402.

*Fabrication, LLC*, 2016 WL 930965, at *4 (D. Md. 2016) ("[T]he court need not decide which state's law to apply.") (citing nothing).

There is thus no Maryland law supporting the District Court's refusal to respect the Cardholder Agreement's choice-of-law provision—and, in contrast, there is directly on-point caselaw refuting it. *See Cunningham,* 441 Md. at 325-26; *Jackson,* 398 Md. at 617. The District Court thus erred in failing to apply Utah and Missouri law to the question before it (even assuming it could properly consider that question). [11]

## B.     Neither Utah Nor Missouri Follow the *Cheek* Rule, and Therefore, Arbitration Should Have Been Compelled Under The Parties' Selected Choice of Law.

That error mattered. As explained in more detail below, *see infra* § III, the District Court rested its conclusion that it need not enforce the Arbitration Agreement on an unusual feature of Maryland substantive law—which requires that an arbitration agreement must be supported by additional consideration, separate and apart from the consideration that provides the basis for the underlying contract—

---

[11] The District Court's error in failing to give effect to the Cardholder Agreement's choice-of-law provision obviates the need to address its separate error in applying the Maryland choice-of-law principles that would govern in the absence of an enforceable choice-of law clause. In particular, the court erred in finding undisputed that the Johnson and Crider Cardholder Agreements were made in Maryland. JA512, *cf.* JA163, JA410 (the Cardholder Agreement "is entered into between you and us in Utah[/Missouri], regardless of the state of your residence or whether or not your Account or Card is used in Utah[/Missouri].").

announced in a Maryland Court of Appeals decision called *Cheek*. *Cheek v. United Healthcare of Mid-Atlantic, Inc.,* 378 Md. at 157. Neither Utah nor Missouri, however, follows the *Cheek* rule. *See, e.g., Hillbery v. Nu Skin Enterprises U.S., Inc.*, 2022 WL 219560, at *5 (D. Utah 2022) ("[When] the agreement to arbitrate is integrated into a larger unitary contract, the consideration for the contract as a whole covers the arbitration clause as well.") (*citing In re Cox Enterprises, Inc. Set-Top Cable Television Box Antitrust Litigation*, 835 F.3d 1195 (10th Cir. 2016) (noting that "[N]othing in Utah law compels a different conclusion" where the plaintiff did not show that in Utah, "each provision of a contract must be supported by consideration expressed in that provision."); *Bridgecrest Acceptance Corp. v. Donaldson,* 648 S.W.3d 745, 753-54 (Mo. 2022) ("Were this Court to accept [the plaintiffs'] argument and find an arbitration clause or agreement forming a part of a larger contract needed separate consideration, it would contravene the often-repeated mandate that agreements to arbitrate must be governed by the same rules as apply generally in contract law. . . [and] violate the black letter law that a court cannot go line by line ensuring each promise is counterbalanced.") (citing *Baker v. Bristol Care, Inc.,* 450 S.W.3d 770, 777 (Mo. 2014) (finding that separate arbitration agreement signed alongside separate employment agreement lacked consideration due to change of terms clause located within arbitration agreement for illusoriness, since there was no valid consideration for employment agreement, either).

26

Therefore, under both Utah and Missouri law, the District Court's stated basis for denying Continental's motion to compel lacks merit and is not a legal basis to refuse arbitration.

For this reason, it was reversible error for the District Court to wholly ignore the parties' choice-of-law clause and errantly apply Maryland law in determining whether an agreement to arbitrate had been formed. Accordingly, this Court should reverse and remand with instructions to the District Court to enforce the choice-of-law clause and finding that under Utah and Missouri law, there is a validly formed agreement to arbitrate that must be enforced according to its terms.

## III. Even Under Maryland Law, the District Court Erred in Holding the Arbitration Agreement To Be Unenforceable Under *Cheek*.

The District Court concluded that the Arbitration Agreement was unenforceable under a Maryland case called *Cheek*, which holds that an arbitration agreement is a separate contract—severable from any larger contract in which it appears—and thus must be independently supported by mutual consideration. *Cheek,* 378 Md. at 152-53. That conclusion, however, runs afoul of Maryland law in at least two ways. *First*, *Cheek* limits a court's review of mutual consideration to the four corners of the Arbitration Agreement itself—and thus prohibits any consideration of the larger Cardholder Agreement containing it. The District Court, however, based its finding of inadequate consideration solely on terms appearing *outside* of the Arbitration Agreement. *Second*, and independently, even if the

District Court could properly consider the entire Cardholder Agreement, its conclusion that there was insufficient consideration was incorrect under Maryland law.

**A.    The District Court Erred in Looking Beyond the Four Corners of the Arbitration Agreement.**

1.    As noted above, *Cheek* holds that an arbitration agreement is an "independently enforceable contract" that is "a severable part" of the larger agreement in which it appears, and so must be independently supported by mutual consideration. *Cheek,* 378 Md. at 152-53; *see also Noohi v. Toll Bros., Inc.,* 708 F.3d at 609-10 ("[A]n arbitration provision must be supported by consideration independent of the contract underlying it, namely, mutual obligation."). Mutual consideration, in this context simply means a mutual promise to arbitrate. *See Cheek*, 378 Md. at 153-54. Accordingly, once a court determines that "there is a mutual exchange of promises to arbitrate," the court's "inquiry ceases, as the agreement to arbitrate has been established as a valid and enforceable contract." *Id.* at 665.

Precisely because *Cheek* renders an arbitration agreement severable from any other contract, courts performing a *Cheek* analysis are "not allowed to look beyond the separate arbitration agreement, signed by the parties, to determine whether the agreement was supported by consideration." *Hill v. PeopleSoft USA, Inc.,* 412 F.3d at 544; *Cheek,* 378 Md. at 152 ("[T]o go beyond the confines of the arbitration

28

agreement itself and into an analysis of the validity of the larger contract, is an inquiry we cannot make."). Of course, if "the language of the arbitration agreement itself" "expressly" "incorporates" some other term of the larger contract, courts may look to that other term—for the express incorporation makes that additional provision a part of the arbitration agreement itself. *Coady v. Nationwide Motor Sales Corp.,* 32 F.4th at 292-93. But absent such express language, the usual rule of *Cheek* and *Hill* governs, and a court may "examine *only* the language of the arbitration agreement itself." *Coady,* 32 F.4th at 291.

Here, there can be no doubt that the Arbitration Agreement passes muster under *Cheek*. Indeed, the terms of the Arbitration Agreement impose upon both Continental and Plaintiffs "a mutually coextensive exchange of promises to arbitrate" disputes. *Noohi,* 708 F.3d at 613. Not only did the Arbitration Agreement require Continental and Plaintiffs to *both* waive "any right to file claims in court" for "any claim that arises out of or in any way relat[ing] to" the Cardholder Agreement, it also extended a number of other terms that applied equally to "you and we" (or "you or we," depending on context. JA136, JA417 (providing that "you **or** we may choose to have a hearing . . . unless you and we agree otherwise," "you or we may ask a court to appoint a substitute arbitrator," "you and we shall retain the right to bring . . . any claims that are within the small claims court's jurisdiction," and imposing mutual obligations on "a party [and] its representative" from

disclosing arbitration "without the prior written consent of all parties,").[12]  Because the Arbitration Agreement thus undoubtedly contains "a mutual exchange of promises to arbitrate," the Arbitration Agreement is, under *Cheek*, "a valid and enforceable contract." 378 Md. at 153-54.

        2.      The District Court held to the contrary only by looking beyond the four corners of the Arbitration Provision—exactly what *Cheek* and its progeny said that it may not do.  Specifically, the District Court looked to a separate provision of the larger Cardholder Agreement (which it called the "Change Clause"), which appeared nearly sixty-two paragraphs prior to, in an entirely separate section from, the Arbitration Agreement.  According to the District Court, the Change Clause rendered the Arbitration Provision unenforceable because it "allow[ed] Continental to alter at will any part of the Agreement, including the Arbitration Provision, such that the original bargained-for promises mean nothing," and so no mutual consideration was exchanged.  JA515  (As explained below, *infra* § III.B, that understanding of the Change Clause is simply incorrect).

     The District Court acknowledged that had the Arbitration Agreement here been "a standalone document, rather than a clause within a broader contract," its analysis of the Change Clause would have been improper.  JA516 (citing *Hill*, 412

---

[12] Indeed, the only provision that was not perfectly mutual was an ability to opt out of arbitration that was extended to Plaintiffs alone—an ability that Plaintiffs both declined to avail themselves of.  *See* JA240, JA497.

F.3d at 543-44).  But because the Arbitration Agreement was contained in the same document as the rest of the broader Cardholder Agreement, the District Court believed that a different rule governed, and it was thus permitted to consider "the plain reading of the contract as a whole."  JA516.  The entire point of *Cheek*, however, is that an arbitration agreement and a contract in which it appears must always be treated as "two separate agreements."  *Cheek*, 378 Md. at 159 n.6.  Said otherwise, an arbitration agreement that (like the Arbitration Agreement here) appears in a larger contract is—under *Cheek*—no different from an agreement that appears in its own, standalone document.  *See id.*

Unsurprisingly, the District Court cited no authority from either this Court or the Maryland courts, supporting its errant conclusion.  In fact, it cited no Maryland authority on this point at all.  *See* JA516.  Rather, it cited two cases (*Hill* and *Coady*) in which the court confined its analysis—just as *Cheek* demands—to the four corners of the arbitration agreement.  Indeed, *Hill* did exactly the opposite of what the District Court did here—by holding an arbitration provision valid, even when contractual terms "beyond the four corners of the Arbitration Agreement" tended to "support" the conclusion that it was invalid.  412 F.3d at 544.  The court in *Coady* likewise confined its analysis (as the District Court here did not) to the four corners arbitration provision, looking only to the terms of the provision itself as well as those that it "expressly" "incorporate[d]."  *Coady*, 32 F.4th at 292-93.  Here, the District

31

Court by its own admission looked beyond the terms of the Arbitration Agreement—including any terms it expressly incorporated—something which both *Hill* and *Coady* not only do not support, but expressly forbid.

For this reason alone, the District Court erred in its application of Maryland law and its holding should be reversed.

**B.  The District Court Erred in Concluding That the Entire Cardholder Agreement Lacked Adequate Consideration.**

1.  Under Maryland's *Cheek* rule, an arbitration agreement is unenforceable for want of sufficient consideration if it can be unilaterally modified "*without notice*."  378 Md. at 141-42 (emphasis added).  That final qualifier is key: An arbitration agreement that allows a unilateral change in terms *only with notice* remains perfectly enforceable.  *See Holloman v. Circuit City Stores, Inc.*, 391 Md. 580, 585 (2006) (upholding arbitration agreement where change in terms clause required 30-day advance written notice); *Harby ex rel. Brooks v. Wachovia Bank, N.A.*, 172 Md. App. 415, 425 (2007) (upholding arbitration agreement where 30 days' notice of changes required only if the change was not in the other party's "favor"); *Mbongo v. Robinhood Markets, Inc.*, 2022 WL 621797, at *7 (Md. Ct. Spec. App. Mar. 3, 2022)  (upholding arbitration agreement that permitted for defendant to post changes to its website, which the other party agreed to check for updates).

32

Here, to the extent the Cardholder Agreement's Change Clause applies to the Arbitration Agreement at all, it is clear that Continental may make changes only after providing notice. Indeed, the Change Clause itself states expressly that Continental's ability to make changes is conditioned "upon such notice to you as is required by law." JA163, JA410. Said otherwise, the Change Clause does not give Continental unfettered power to change the terms of the Cardholder Agreement (or the Arbitration Agreement) at will; rather it provides that any change will be effective only if it was preceded by the notice demanded by the law as set out in *Cheek* and *Holloman*. *See Law,* Black's Law Dictionary (11th ed. 2019) (defining "law" to include "judicial precedents"). That crucial limitation on Continental's ability to effect changes constitutes adequate consideration under Maryland law. *Cheek,* 378 Md. at 141-42; *Holloman*, 391 Md. at 585.

2. The District Court held otherwise only by concluding that the limitation just discussed "does not appear to restrict Continental from changing the Agreement terms in any way." JA515. In other words, the District Court simply read the language "upon such notice to you as is required by law" out of the Cardholder Agreement altogether. *See id.* The District Court justified this conclusion on the grounds that the Cardholder Agreement "does not cite any law that requires such notice, nor does it articulate what is meant by" the term "law." JA518. But there is no rule—and the District Court certainly cites none—holding

33

that the phrase "law" has meaning only if it is accompanied by cites to chapter and verse. Indeed, it is difficult to imagine what "law" in this context could even conceivably refer to, if not cases like *Cheek* and *Holloman* which specifically discuss what kind of notice is required to make a contractual change provision valid.

In any event, in addition to flouting the plain text, the District Court's reading also runs headlong into basic principles of Maryland contract law. For one thing, Maryland's "basic principles of contract interpretation" require avoiding "constructions that render language meaningless[ or] superfluous." *Rota-McLarty v. Santander Consumer USA, Inc.,* 700 F.3d 690, 701 (4th Cir. 2012). The District Court's reading would—by its own admission—do just that, by interpreting the limitation "upon such notice to you as is required by law" to not "restrict Continental from changing the Agreement terms in any way." JA515. That alone is reason to reject the District Court's holding.

What is more, the District Court's reading of the Cardholder Agreement—which has the effect of rendering both the entire Cardholder Agreement generally, and the Arbitration Agreement specifically, as "illusory," JA520—runs afoul of the rule that Maryland law "prefer[s] a construction of a contract which will make the contract effective rather than one which will make it illusory or unenforceable."

34

*Questar Builders, Inc. v. CB Flooring, LLC*, 410 Md. 241, 272-73 (2009) (applying *Cheek*).[13]

      At best, the District Court had before it two alternative readings of the Change Clause—one that gave meaning (indeed, the ordinary meaning) to the phrase "upon such notice to you as is required by law" and rendered the Cardholder Agreement and Arbitration Agreement valid and enforceable; and one that disregarded plain text, made the operative phrase utterly superfluous, and rendered the contract a nullity. Maryland law is clear about which interpretation it prefers. The District Court, at every turn, chose the opposite. For this reason too, the District Court's decision must be reversed.

---

[13] For similar reasons, the District Court erred in its in-passing suggestion that the notice requirement was invalid here because it might be understood to contemplate "mere notification *after-the-fact*," which would be "illusory [under] *Cheek*." JA518-519. If, as the District Court says, *Cheek* requires advance notice, then so too does the Change Clause which (as explained above) incorporates the requirements of applicable "law." *See supra* § III.B. What is more, the Change Clause's specification that changes can be made upon "upon … notice" makes clear that any changes could take effect only after the notice is provided. *See Skinker v. State*, 239 Md. 234, 238-39 n.2 (1965) ("The introductory word 'upon' means 'after.'"); *see also Granholm v. Heald*, 544 U.S. 460, 506 (2005) (discussing prior ruling explaining that the phrase "*upon* arrival in such State . . . meant that state law could regulate imports only *after* their delivery" (emphasis added)); *Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, 379 F.3d 159, 173-74 (5th Cir. 2004) (a company's "right to change the terms *upon* notice does not mean that the contract never bound it" because it was "required to give the customer notice of the *proposed* change" (emphasis added)).

## CONCLUSION

The decision below should be reversed and remanded with instructions to compel arbitration.

Dated: March 29, 2024

Respectfully submitted,

*/s/ Fredrick S. Levin*
Fredrick S. Levin
ORRICK, HERRINGTON & SUTCLIFFE LLP
631 Wilshire Blvd.
Suite 2-C
Santa Monica, CA 90401
T: (310) 424-3900
F: (310) 633-2800
flevin@orrick.com

Sarah B. Meehan
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Ave.
Washington, DC 20037
T: (202) 349-8000
F: (202) 349-8080
smeehan@orrick.com

*Counsel for Appellants*
*Continental Finance Company, LLC*
*and Continental Purchasing, LLC*

## STATEMENT REQUESTING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a)(1) and Fourth Circuit Rule 34(a), Appellants Continental Finance Company, LLC and Continental Purchasing, LLC hereby respectfully request oral argument before this Court. Resolution of these issues would be facilitated if the Court had the opportunity to question the Parties and hear elaboration on the briefing.

Dated: March 29, 2024                    Respectfully submitted,

                                         */s/ Fredrick S. Levin*
                                         Fredrick S. Levin
                                         ORRICK, HERRINGTON & SUTCLIFFE LLP
                                         631 Wilshire Blvd., Suite 2-C
                                         Santa Monica, CA 90401
                                         T: (310) 424-3900
                                         F: (310) 633-2800
                                         flevin@orrick.com

                                         Sarah B. Meehan
                                         ORRICK, HERRINGTON & SUTCLIFFE LLP
                                         2100 Pennsylvania Ave.
                                         Washington, DC 20037
                                         T: (202) 349-8000
                                         F: (202) 349-8080
                                         smeehan@orrick.com

                                         *Counsel for Appellants*
                                         *Continental Finance Company, LLC*
                                         *and Continental Purchasing, LLC*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the length limitation of Fed. R. App. P. 32(a)(7) because:

   [x] This brief contains 8775 words, excluding the parts exempted by Fed. R. App. P. 32(f). As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

   [x] This brief has been prepared in a proportionally spaced 14-point Times New Roman font using Microsoft Word.


Dated: March 29, 2024                    Respectfully submitted,

                                         */s/ Fredrick S. Levin*
                                         Fredrick S. Levin

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document using the appellate CM/ECF system on March 29, 2024.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished using the appellate CM/ECF system.

Respectfully submitted,

*/s/ Fredrick S. Levin*
Fredrick S. Levin