**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 23-2047**

───────────────

TIFFANY JOHNSON; TRACY I. CRIDER, individually and on behalf of all others
similarly situated,

       Plaintiffs – Appellees,

v.

CONTINENTAL FINANCE COMPANY, LLC; CONTINENTAL
PURCHASING, LLC,

       Defendants – Appellants,

and

CKS PRIME INVESTMENTS, LLC,

       Defendant.

------------------------------

PUBLIC JUSTICE,

       Amicus Supporting Appellee.

───────────────

**No. 23-2049**

───────────────

TRACY I. CRIDER, individually and on behalf of all others similarly situated,

       Plaintiff – Appellee,

v.

CONTINENTAL FINANCE COMPANY, LLC; CONTINENTAL PURCHASING, LLC,

        Defendants – Appellants,

and

CKS PRIME INVESTMENTS, LLC,

        Defendant.

------------------------------

PUBLIC JUSTICE,

        Amicus Supporting Appellee.

———————

Appeals from the United States District Court for the District of Maryland, at Greenbelt. Paula Xinis, District Judge.  (8:22-cv-02001-PX; 8:23-cv-00854-PX)

———————

Argued:  December 12, 2024                                    Decided:  March 11, 2025

———————

Before WILKINSON, NIEMEYER, and WYNN, Circuit Judges.

———————

Affirmed by published opinion. Judge Wilkinson wrote the opinion in which Judge Wynn joined. Judge Wynn wrote a concurring opinion. Judge Niemeyer wrote an opinion concurring as to Parts II and III-A and dissenting as to Part III-B.

———————

**ARGUED:**  Fredrick S. Levin, ORRICK, HERRINGTON & SUTCLIFFE LLP, Santa Monica, California, for Appellants.  Benjamin Howard Carney, GORDON, WOLF & CARNEY, CHTD., Hunt Valley, Maryland, for Appellees.  **ON BRIEF:**  Sarah B. Meehan, ORRICK, HERRINGTON & SUTCLIFFE LLP, Washington, D.C., for Appellants.  Richard S. Gordon, GORDON, WOLF & CARNEY, CHTD., Hunt Valley, Maryland, for Appellees.  Leah M. Nicholls, PUBLIC JUSTICE, Washington, D.C., for Amicus Curiae.

———————

WILKINSON, Circuit Judge:

Defendants Continental Finance Company, LLC and Continental Purchasing, LLC (collectively, "Continental") challenge the district court's denial of their motion to compel arbitration of certain state claims related to a credit card agreement. The district court found that the parties' arbitration agreement was rendered illusory under Maryland law due to a "change-in-terms" clause allowing Continental to "change any term of [the credit card] Agreement" at its "sole discretion, upon such notice . . . required by law." On appeal, Continental argues that the district court should have sent the illusoriness issue to arbitration, that the court erred by refusing to apply the contract's choice-of-law clause, and that the arbitration agreement was not illusory under Maryland law.

We agree with the district court on all three issues and affirm the judgment below. The district court was initially correct in holding that it was for the court, not the arbitrator, to determine whether the contract was illusory. A claim that a contract is illusory calls into question the very existence of the contract, and it is always incumbent on the court to ensure that the parties formed a valid agreement to arbitrate before sending a dispute to arbitration. We also agree that the district court could not apply the contract's choice-of-law provision to this contract-formation question because the choice-of-law provision presupposes the existence of a validly formed contract. Finally, we think the district court was correct in interpreting Maryland law to hold that the arbitration agreement was rendered illusory. The change-in-terms clause here is so one-sided as to deprive the purported contract of any meaningful idea of reciprocity that a contractual bargain is meant to embody.

I.

Appellants in this case are Continental Finance Company, LLC and its wholly owned subsidiary Continental Purchasing, LLC. Continental is a high-interest lender that markets and services credit card accounts for consumers with poor credit. Appellees are Tiffany Johnson and Tracy Crider, two Maryland residents who obtained credit card accounts marketed, underwritten, and serviced by Continental.

This dispute began when Johnson and Crider brought separate class-action lawsuits against Continental in Maryland state court. The complaints alleged that Continental engages in widespread violations of Maryland usury laws by extending credit without a license and charging interest rates far above statutory limits. According to Johnson and Crider, Continental attempts to evade usury laws through what is commonly referred to as a "rent-a-bank" scheme. In a "rent-a-bank" scheme, a high-interest lender channels its loans through a federally chartered bank in an effort to take advantage of the bank's exemption from state usury laws. The lender handles the marketing and underwriting, the bank issues the loan, then the lender immediately acquires the loan from the bank. Because the credit is initially extended by the exempt bank, the subprime lender claims that the exemption from usury laws travels with the loan.

The complaints claimed that, under Maryland law, a company acquiring a loan through a "rent-a-bank" scheme is the "*de facto* lender" and must abide by state usury laws. *CashCall, Inc. v. Md. Comm'r of Fin. Regul.*, 139 A.3d 990, 1005 (Md. 2016). Because Continental did not do so, Johnson and Crider requested statutory damages and declaratory judgments establishing that their loans were void and unenforceable.

4

Continental timely removed both cases to the District of Maryland and filed motions to compel arbitration. The company argued that when Johnson and Crider accepted and used their credit cards they agreed to the terms of a "cardholder agreement" containing an arbitration provision. The arbitration provision read as follows:

> Unless you opt out of this Provision in the manner set forth below in subpart (p), any claim that arises out of or in any way relates to the Agreement, your Account, or this Provision (the "Claim(s)") shall be resolved exclusively by binding bilateral arbitration . . . .[1]

J.A. 149. Because Johnson and Crider's claims plainly relate to their credit accounts, Continental argued that they fell squarely within the scope of the arbitration provision.

Johnson and Crider opposed the motions to compel arbitration. They argued that the cardholder agreements lacked consideration and were never formed due to a "change-in-terms" clause allowing Continental to unilaterally alter any term in the agreement at its "sole discretion." The change-in-terms clause provided as follows:

> We can change any term of this Agreement, including the rate at which or manner in which **INTEREST CHARGES**, Fees, and Other Charges are calculated, in our sole discretion, upon such notice to you as is required by law. At our option, any change will apply both to your new activity and to your outstanding balance when the change is effective as permitted by law.

J.A. 163. In Johnson and Crider's view, Continental's ability to change any term of the agreement at its "sole discretion" rendered all of its promises illusory. They therefore contended that Continental never made a binding promise that could establish consideration under Maryland law.

---

[1] Because the cardholder agreements are nearly identical, we cite only the language of Johnson's agreement unless otherwise specified.

Continental raised three arguments in response. First, it argued that Johnson and Crider's challenge to the formation of the agreement must be decided by the arbitrator, not the district court. Second, Continental argued that even if the court could decide the formation issue it should prevail under Utah and Missouri law pursuant to the choice-of-law provisions in the agreements. Third, Continental contended that the arbitration agreement was supported by proper consideration even under Maryland law.

The district court consolidated Johnson and Crider's cases and denied Continental's motions to compel arbitration. Relying on our cases, the court first determined that "the district court, not the arbitrator, must decide whether the parties ever formed an agreement to arbitrate." *Johnson v. Continental Fin. Co.*, 690 F. Supp. 3d 520, 526 (D. Md. 2023). It then rejected Continental's argument that the choice-of-law provisions required the court to apply Utah and Missouri law, reasoning that it could not enforce the agreement's choice-of-law clause before deciding if the agreement existed. *Id.* Finally, the court concluded that the cardholder agreement was illusory under Maryland law. While the change-in-terms clause purported to allow changes only if Continental provided "notice . . . required by law," the court held that this language posed no obstacle to Continental escaping its contractual obligations because it could simply change the terms and provide "notification after-the-fact." *Id.* at 529.

Continental timely appealed. It argues that the district court erred on all three issues. We now consider each issue in turn.

6

II.

We first address Continental's argument that whether the change-in-terms clause rendered the cardholder agreement illusory was a question for the arbitrator, not the district court.

We agree with the district court that the threshold issue of contract formation is for the district court, not the arbitrator. Under Section 4 of the FAA, courts may only order arbitration "upon being satisfied that the making of the agreement for arbitration . . . is not in issue." 9 U.S.C. § 4. A challenge to a contract's formation necessarily puts the "making" of any arbitration provision within that contract at issue. It would defy the plain text of the FAA to enforce an arbitration clause without first determining that the contract in which it is contained was properly formed.

Section 4 of the FAA "reflects the fundamental principle that arbitration is a matter of contract." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 147 (2024) (quoting *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010)). A basic corollary of this principle is that "arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit [their] grievances to arbitration." *AT&T Tech., Inc. v. Comm'cs Workers of Am.*, 475 U.S. 643, 648–49 (1986). We do not doubt the many virtues of arbitration. The arbitral process often provides parties with a cheaper, faster, and simpler way to resolve their disputes. But in our legal system a party cannot be forced to arbitrate. "Consequently, the first question in any arbitration dispute must be: What have these parties agreed to?" *Coinbase*, 602 U.S. at 148.

Continental sees it differently. In its view, the text of the arbitration provision itself requires that contract-formation issues be resolved in arbitration. It points us to the arbitration provision's "delegation clause," which requires that "[a]ll issues of arbitrability must be arbitrated, including but not limited to whether the [Arbitration] Provision is enforceable or applicable." J.A. 170. According to Continental, Johnson and Crider's formation challenge is an "issue[] of arbitrability" because the arbitration provision is not "enforceable or applicable" if the agreement in which it is contained was never formed.

We think this argument is a dead end. Like the arbitration provision, the delegation clause is contained within the cardholder agreement. It would put the cart before the horse to enforce any provision of the agreement, including the delegation clause, before deciding whether the agreement itself was ever formed. *See Rent-A-Center*, 561 U.S. at 68–70 (holding that delegation provisions are simply "an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce."); *see also Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286, 291 (4th Cir. 2020). Continental's insistence that we enforce the delegation provision therefore takes us back to square one.

Perhaps sensing this vulnerability, Continental builds the bulk of its case on a fallback argument. It argues that Johnson and Crider's challenge to the agreement's formation must be resolved by the arbitrator under the "severability principle" established in *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395 (1967), and *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006). Continental's reasoning proceeds in two steps. It first observes that *Prima Paint* and *Buckeye* held that "a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must

8

go to the arbitrator." *Buckeye*, 546 U.S. at 449; *see* Opening Brief at 12. It then argues that Johnson and Crider's illusoriness challenge attacks the validity of the contract as a whole, not the arbitration clause specifically. After all, Continental reasons, a contract only fails for want of consideration if there is no binding promise in the *entire agreement*. *See* Opening Brief at 15; *see also In re Cox Enterprises, Inc. Set-top Cable Television Box Antitrust Litigation*, 835 F.3d 1195, 1211 (10th Cir. 2016) (holding that an illusory consideration challenge "can prevail only as an attack on the . . . agreement as a whole" and therefore "must be resolved by the arbitrator").

Continental misreads *Prima Paint* and *Buckeye*. The severability doctrine established in those cases plainly applies to "a challenge to the *validity* of [a] contract," not a challenge to its *formation*. *Buckeye*, 546 U.S. at 449. Any new law student learns the distinction between contract formation and validity. A claim that a contract was never *formed* negates one of the two essential elements of a contract—mutual assent and consideration. *See* Restatement (Second) of Contracts § 17(1) (Am. L. Inst. 1981). By contrast, a claim that a contract is *invalid* presupposes the existence of a contract but maintains that it should not be enforced. *See* Restatement (Second) of Contracts §§ 7–8.

The key difference between formation and validity challenges lies in their impact. Formation challenges render the whole contract unenforceable. There is nothing to enforce if a contract never existed. *See* Restatement (Second) of Contracts § 17. A validity challenge, on the other hand, requires courts to discern which parts are the agreement are invalid. When a contract contains some valid provisions and some invalid ones, the court must decide if it can sever the valid provisions and enforce the rest of the agreement. *See*

9

Mark L. Movsesian, *Severability in Statutes and Contracts*, 30 GA. L. REV. 41, 47 (1995). This inquiry turns on intent—did the parties intend enforcement of the valid provisions to be conditional on the enforcement of the invalid ones? *See id.* at 47–48.

*Prima Paint* and *Buckeye* both dealt with challenges that called into question the validity of the substantive provisions of a contract but not its arbitration clause. In *Prima Paint*, for example, the claim was that F&C "fraudulently represented it was solvent and able to perform its contractual obligations" to provide consulting services. *Prima Paint*, 388 U.S. at 398. As the Supreme Court emphasized, "no claim ha[d] been advanced by Prima Paint that F&C fraudulently induced it to enter into the agreement to arbitrate." *Id.* at 406. The question in the case, therefore, was whether the potentially invalid consulting provisions were severable from the otherwise valid arbitration clause. The Court answered that they were. It reasoned that the text of the arbitration clause was "easily broad enough to encompass Prima Paint's [fraud] claim" and emphasized there was no claim the parties "ever intended" the fraud issue to be "excluded from arbitration." *Id.*

Likewise, the plaintiffs in *Buckeye* argued "that the illegality of one of the contract's provisions render[ed] the whole contract invalid." *Buckeye*, 546 U.S. at 444. Specifically, the claim was that the "contract as a whole (including its arbitration provision) [was] rendered invalid by [a] usurious finance charge." *Id.* Once again, the question was whether the potentially invalid provision could be severed from the arbitration clause. The Court held that *Prima Paint* answered this question by holding that "as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the

10

contract." *Id.* at 445. This severability question could only have been posed if some provisions in a previously formed contract were arguably valid.

Neither *Prima Paint* nor *Buckeye* addressed contract formation. Indeed, *Buckeye* took care to emphasize that "the issue of the contract's validity is different from the issue [of] whether any agreement . . . was ever concluded." *Id.* at 444 n.1. According to the Supreme Court, its opinion "addresse[d] only the former" and "[did] not speak to" formation issues such as "whether the alleged obligor ever signed the contract, whether the signor lacked authority to commit the alleged principal, and whether the signor lacked the mental capacity to assent." *Id.* This distinction is underscored by common sense. Once again, if a contract was never formed, there is no agreement from which any provision, including an arbitration clause, can be severed.

To the extent there was any lingering uncertainty about this, the Supreme Court definitively resolved it in *Granite Rock Co. v. International Brotherhood of Teamsters,* 561 U.S. 287 (2010). In *Granite Rock*, the Court emphasized that "where the dispute at issue concerns contract formation, the dispute is generally for the courts to decide." 561 U.S. at 296. It also dispelled any notion that *Prima Paint* or *Buckeye* altered this rule. According to the Court, *Prima Paint* and *Buckeye* "cannot be divorced from the first principle that underscores all of [its] arbitration decisions," which is that "[a]rbitration is strictly 'a matter of consent,' and thus 'is a way to resolve those disputes—*but only those disputes*—that the parties have agreed to submit to arbitration.'" *Id.* at 299 (first quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989); then quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)). It therefore held that "the court

must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce." *Id.* at 297. In sum: No agreement, no arbitration.

We have since applied *Granite Rock* on multiple occasions. In *Berkeley County School District v. Hub International Ltd.*, 944 F.3d 225, 241 (4th Cir. 2019), for example, we considered whether the district court or an arbitrator should resolve the claim that certain brokerage agreements containing arbitration provisions were never formed because the signor lacked authority to bind the plaintiff. We started our analysis by citing *Granite Rock* for the proposition that "the district court — rather than an arbitrator — [must] decide whether the parties have formed an agreement to arbitrate." *Id.* at 234 (citing *Granite Rock*, 561 U.S. at 296). We then held that the authority question presented an issue for the court because "whether the agent possesses actual or apparent authority to bind his principal goes to the formation of a contract." *Id.* at 238.

We applied the same rule in *Rowland v. Sandy Morris Financial & Estate Planning Services, LLC*, 993 F.3d 253 (4th Cir. 2021). In that case, we determined that the district court correctly resolved a plaintiff's claim that there was "no meeting of the minds" because the parties submitted materially different versions of an agreement containing an arbitration provision. *Id.* at 259. Again citing *Granite Rock*, we held that "when the parties

disagree as to whether an agreement to arbitrate has been formed, 'the dispute is generally for courts to decide.'" *Id.* at 258 (citing *Granite Rock*, 561 U.S. at 296).[2]

As a last effort, Continental argues that illusoriness challenges pertain to validity, not formation. We disagree. It is rudimentary contract law that an agreement lacks consideration, and is therefore never formed, when it consists entirely of illusory promises. *See* Restatement (Second) of Contracts § 77. Consideration requires a bargained-for-exchange. An exchange by definition requires each side to give the other something of value. When one side can avoid all of its obligations, the agreement lacks the kind of basic reciprocity that is necessary to form a binding contract. *See Hamer v. Sidway*, 27 N.E. 256, 257 (N.Y. 1891).

## III.

### A.

We now turn to the merits of Johnson and Crider's contract formation challenge. Whether an arbitration agreement was properly formed is "a question of ordinary state

---

[2] *Amos v. Amazon Logistics, Inc.*, 74 F.4th 591 (4th Cir. 2023) is not to the contrary. Labels aside, the factual context and the parties' briefing in that case make clear that the plaintiff's real challenge was to the validity of the change-in-terms clause, not to the contract's formation. Indeed, the plaintiff presented its argument that the agreement was "illusory and unconscionable" as a single claim that depended on the lack of a "reasonable alternative" to approving the defendant's changes. *See Amos*, Opening Brief at 46. A party cannot transform a run-of-the-mill unconscionability claim into a contract-formation challenge simply by calling it one. Furthermore, it is clear from the language of our opinion that we understood the plaintiff's argument as a validity challenge. We stated that the relevant rule was that "contract-*validity* contentions going to the contract as a whole must be deferred for consideration during arbitration." *Amos*, 74 F.4th at 595 n.4 (emphasis added).

contract law principles." *Rowland*, 993 F.3d at 258. The first question we must address, therefore, is which state's law controls. We apply the choice-of-law rules of the state in which the district court sits—here, Maryland. *See Klaxon Co. v. Stentor Mfg. Co.*, 313 U.S. 487, 496 (1941).

Continental argues that we must enforce the cardholder agreement's choice-of-law clause specifying that Utah law (in Johnson's case) and Missouri law (in Crider's case) apply to issues of "formation, legality, enforceability, and interpretation." Opening Brief at 22–23 (quoting J.A. 410). As with the delegation clause, this argument is circular. The choice-of-law clause tells us to apply Utah and Missouri law to contract-formation issues, but we cannot apply *any* provision of the contract, including its choice-of-law clause, before deciding if the parties formed an agreement.

Anticipating this problem, Continental relies on the Maryland Supreme Court's decision in *Jackson v. Pasadena Receivables, Inc.*, 921 A.2d 799, 803 (Md. 2007), which held that "parties to a contract may agree as to the law which will govern their transactions, even as to issues going to the *validity* of the contract." But once again, Continental conflates validity with formation. In *Jackson*, the plaintiff "ha[d] not denied the existence of the [contract]" containing the choice-of-law clause. *Id.* at 802. Here, by contrast, Johnson and Crider claim that the cardholder agreement was never formed. It would be nonsensical to enforce a choice-of-law clause in a nonexistent contract. *See*, *e.g.*, *Realogy Holdings Corp. v. Jongebloed*, 957 F.3d 523, 531 n.11 (5th Cir. 2020) ("When determining the preliminary question of contract formation, we do not resort to any contractual choice-of-law provision.").

14

Without an enforceable choice-of-law clause, we must apply the law of the state "where the last act necessary to make the contract binding occurs." *Konover Prop. Tr., Inc. v. WHE Assocs., Inc.*, 790 A.2d 720, 728 (Md. App. 2002); *see also Francis v. Allstate Ins. Co.*, 709 F.3d 362, 369–70 (4th Cir. 2013). Here, as the district court found, "[t]he parties do not dispute that the cardholder agreement was 'made' where plaintiffs accepted and used the card," which was Maryland. *Johnson*, 690 F. Supp. 3d at 526. We therefore apply Maryland law to determine whether the cardholder agreement was formed.

## B.

We last consider whether the arbitration agreement is illusory under Maryland law. We conclude that it is. The change-in-terms clause allows Continental to "change *any* term of [the] Agreement in [its] *sole discretion*, upon such notice to [Johnson and Crider] as is required by law." J.A. 163 (emphasis added). Maryland courts have found this kind of clause to be so one-sided and vague that it allows a party to escape all of its contractual obligations at will.

In our view, this case is indistinguishable from the Maryland Supreme Court's decision in *Cheek v. United Healthcare of Mid-Atlantic, Inc.*, 835 A.2d 656 (Md. 2003). The change-in-terms clause in *Cheek* permitted the defendant to "alter, amend, modify, or revoke the [arbitration agreement] at its sole and absolute discretion at any time with or without notice." *Id.* at 658. The court determined that this clause rendered the defendant's promises "entirely illusory" because the "unambiguous language" permitted it to avoid all of its contractual obligations. *Id.* at 662. It therefore held that there was "insufficient consideration to support an enforceable agreement to arbitrate." *Id.*

15

Continental contends that *Cheek* is inapplicable for two reasons. One, it claims that *Cheek* limits our review to the "four corners" of the arbitration provision and thus prevents us from considering the effect of the change-in-terms clause. Opening Brief at 27. Two, Continental emphasizes that the clause in *Cheek* permitted modifications "without notice." *Id.* at 32 (quoting *Cheek*, 835 A.2d at 669). It then argues that a different Maryland case, *Holloman v. Circuit City Stores, Inc.*, 894 A.2d 547 (Md. 2006), found sufficient consideration when a change-in-terms clause required notice of changes. Because the clause in the cardholder agreement only permits changes "upon such notice . . . required by law," Continental concludes that the facts here are more analogous to *Holloman* than *Cheek*. *See* Opening Brief at 27–28, 32–34.

We begin with the "four corners" argument. Even a cursory reading reveals that Continental's interpretation of *Cheek* is meritless. *Cheek* does establish that an arbitration agreement is an "independently enforceable contract" and that courts should not go "beyond the confines of the arbitration agreement itself" when determining if an agreement was formed. *Cheek*, 835 A.2d at 664–65. The court did not say, however, that the terms of the arbitration agreement are artificially limited to the words that happen to appear under the "arbitration provision" heading. Under Maryland law, courts "'construe the contract as a whole' and decline to 'read each clause or provision separately.'" *Coady v. Nationwide Motor Sales Corp.*, 32 F.4th 288, 291 (4th Cir. 2022). Here, the language of the change-in-terms clause plainly applies to "any term of [the] Agreement," including the arbitration clause. J.A. 163.

16

The notice argument is equally unavailing. To begin with, Continental misreads *Holloman*. The change-in-terms clause in that case could not be more different than the clause here. It allowed the defendant to modify the agreement only "on December 31 of any year upon giving 30 calendar days written notice." *Holloman*, 894 A.2d. at 550. The court found "these limitations to be adequate to create a binding obligation" because the defendant was "bound to the terms of the arbitration agreement for 364 days" and was required to "provide thirty-days notice prior to any modification." *Id.* at 554.

The change-in-terms clause here contains no such limitations. It allows Continental to change "any term of [the] Agreement" at its "sole discretion, upon such notice . . . required by law." J.A. 163. The plain language of the clause merely commits Continental to do what it is already required to do by law. That cannot furnish consideration. A bargained-for-exchange by definition assumes that each party will undertake some obligation beyond those already imposed by law. *See* 3 Williston on Contracts § 7:42 (4th ed. 2024).

Continental tries to jump this hurdle by asserting that "required by law" should be read to mean "required to make the contract enforceable by law." And since *Cheek* and *Holloman* held that an advance notice requirement is necessary to make a change clause enforceable, Continental argues that the clause here should be interpreted to include such a requirement. *See* Opening Brief at 34.

We think this reading of the change clause is contradicted by its text. By its terms, the change clause compels Continental to provide "such notice . . . required by law," not "such notice . . . required to make the contract enforceable by law." J.A. 163. Further, the

17

clause explicitly allows Continental to make changes at its "sole discretion." *Id.* This sweeping grant of unilateral authority leaves no room for an interpretation that imposes any kind of limitation on Continental.

Moreover, the plain language of the change clause simply requires Continental to provide "notice"—not "prior notice" or any other kind of notice. Standing alone, the term "notice" is so broad and vague as to be meaningless. The history of this case illustrates that very point. In 2022, Continental unilaterally amended the arbitration provision to remove a term requiring it to advance filing fees for the arbitration. When Continental made this change, it provided "notice" by posting an updated version of the cardholder agreement on its website. J.A. 229, 239–40. This type of after-the-fact, ineffectual notice is not only likely to elude a cardholder. It also places no constraint on Continental's ability to escape its contractual obligations whenever it sees fit.

Our fine colleague in dissent sees it differently. In his view, Continental does not have unfettered modification power because Johnson and Crider can reject changes by exercising their contractual right to "terminate [their] Account at any time." J.A. 167. But, again, the change-in-terms clause allows Continental to "change *any term* of [the] Agreement," including the termination clause, "in [its] *sole discretion*." J.A. 163 (emphasis added). Like every other supposed "right" in the agreement, the right to terminate is illusory because it exists only at Continental's pleasure.

Seeing this problem, the dissent alternatively argues that under the Maryland Supreme Court's decision in *DIRECTV, Inc. v. Mattingly* a change-in-terms clause requiring "notice" *implicitly* gives the non-modifying party the right to reject changes. 829

18

A.2d 626 (Md. 2003). But *DIRECTV* said no such thing. In that case, the Maryland Supreme Court interpreted a change clause in a television service contract providing that "[i]f any changes are made, [the provider] will send [the customer] a written notice describing the change and its effective date. *If a change is not acceptable to [the customer], [he] may cancel [his] service.*" *Id.* at 629, 634–35 (emphasis added). There, the customer's right to reject changes only existed because the change clause itself explicitly provided for it. Here, by contrast, the change clause affords Johnson and Crider no such right. It instead grants Continental the power to make modifications in its "sole discretion." J.A. 163. No questions asked.

And that is not all. The notice language in *DIRECTV* was far more detailed than the scant "notice . . . required by law" language here. It required the TV provider to send a "written notice describing the change and its effective date" to the customer. As the Maryland Supreme Court explained, this language obligated the provider "to let [the customer] know when a change occurred and what that change entailed, presumably before the change purportedly became effective." *DIRECTV*, 829 A.2d at 634. A contract that mandates advance, detailed notice constrains the modifying party by giving the other side a chance to end the contract before the change takes effect. As we have explained, the "notice . . . required by law" language here does nothing of the sort.

In short, the change-in-terms clause here is so one-sided and so nebulous that it deprives the agreement of the kind of minimum reciprocity needed to form a contract under Maryland law. In reaching this conclusion, we stress that our holding reflects only the judgment of the Maryland courts. Contract formation is a question of state common law.

19

The courts of Maryland have chosen to protect consumers from change-in-terms clauses that allow sophisticated parties like Continental to enjoy a built-in escape hatch from their contractual obligations. Other states are entitled to adopt or reject Maryland's approach. The beauty of federalism lies in states being free to chart their own course.

IV.

For the foregoing reasons, the judgment of the district court is affirmed.

*AFFIRMED*

WYNN, Circuit Judge, concurring:

I agree with Judge Wilkinson's majority opinion that, to the extent Plaintiffs' defenses to arbitrability implicate the formation of the cardholder agreement, the proper forum for adjudicating those defenses is a court. As the majority opinion correctly explains, an arbitration clause is severable from a properly-formed-but-possibly-invalid container contract, but not from an *unformed* container contract.

I write separately to clarify that Johnson and Crider do not argue, nor did the district court conclude, that the cardholder agreement itself is unformed. In opposing Continental's motions to compel arbitration, Plaintiffs "*specifically* challenge[d] the *arbitration and delegation clauses* as illusory." J.A. 198 (emphases in original); *see* J.A. 449 (similar). The district court agreed, and denied Continental's motions because "the arbitration agreement"—not the broader cardholder agreement—"lacks consideration." *Johnson v. Cont'l Fin. Co.*, 690 F. Supp. 3d 520, 530 (D. Md. 2023). On appeal, Plaintiffs again exclusively challenge the arbitration and delegation clauses, and expressly disclaim the argument that "the lack of a mutual promise to arbitrate could or would interfere with the formation of the underlying Cardholder Agreement." Response Br. at 21.

Continental argues that "even if Plaintiffs' challenge concerned only the Arbitration Agreement, it would still be reserved for the arbitrator" because the agreement's delegation clause "expressly states that issues of arbitrability are to be decided by the arbitrator." Opening Br. at 19. But that is plainly incorrect. A delegation clause can reserve for arbitration gateway disputes concerning the validity or scope of an arbitration agreement— *i.e.*, arbitrability disputes—but not its *formation*, which is always a matter of contract law.

21

*See, e.g., Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 299 (2010) ("[C]ourts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor* (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue.").

Under the contract law that applies here—Maryland's—an arbitration provision contained within a broader contract is a separate agreement that requires separate consideration in order to be legally formed. *See Holmes v. Coverall N.A., Inc.*, 649 A.2d 365, 371 (Md. 1994); *Noohi v. Toll Bros.*, 708 F.3d 599, 609 (4th Cir. 2013). When that separate consideration is specifically challenged, as it is here, a court must resolve that threshold formation dispute—even if the consideration supporting the container contract is not disputed, and even if downstream arbitrability issues have been validly delegated to the arbitrator.

The majority opinion correctly reaches this threshold dispute, and correctly concludes that the cardholder agreement's change clause undermines the only consideration supporting the separate-but-included arbitration agreement: a mutual promise to arbitrate. That arbitration agreement is therefore, as a matter of Maryland contract law, unformed.[*]

---

[*] Although the majority opinion suggests otherwise, the change clause is not necessarily fatal to the cardholder agreement itself. Continental's provision of services in exchange for payment may suffice as consideration for that broader contract. But under Maryland law, "[t]he consideration for the unilateral" container contract cannot "serve as the consideration for the separate bilateral agreement to arbitrate, because the parties to (Continued)

I understand these observations to be in line with the majority opinion's reasoning, and therefore join that opinion in full.

---

such a bilateral agreement bargained for mutual promises to forgo their rights to go to court and resolve disputes in arbitration." *Cheek v. United Healthcare of Mid-Atl., Inc.*, 835 A.2d 656, 668 n.6 (Md. 2003). It is that separate bargain that is undermined by the change clause here. (Consequently, while I agree with the majority opinion that "[i]t would be nonsensical to enforce a choice-of-law clause in a nonexistent contract," *supra* at 14, the legally nonexistent contract here is the arbitration agreement, not the cardholder agreement in which it appears.)

Relatedly, my colleague in dissent may be correct that Plaintiffs could assent to a unilateral modification of the broader cardholder agreement "by continuing to use their credit cards"—at least, where the modification does not inherently undermine the consideration supporting the cardholder agreement. Op. of Niemeyer, J., dissenting, *infra* at 27. But the parties' separate, bilateral arbitration agreement is supported *solely* by the mutual exchange of promises to arbitrate. A modification that unilaterally withdraws one side's promise with only *post hoc* notice—which the change clause here permits Continental to do at any time, including after arbitration begins—would torpedo that separate agreement. *See Holloman v. Circuit City Stores, Inc.*, 894 A.2d 547, 554 (Md. 2006).

NIEMEYER, Circuit Judge, concurring in part and dissenting in part:

In this case, both plaintiffs, Tiffany Johnson and Tracy Crider, entered into credit card agreements with Continental Finance Company. By their terms each agreement became binding on the plaintiff "upon the earlier of your acceptance and use of the Card to make a purchase or to receive a cash advance, or your payment of INTEREST CHARGES, Fees or Other Charges. You may reject this Card, provided that you have not yet used the Card or paid INTEREST CHARGES, Fees, or Other Charges after receiving a Monthly Billing Statement." Each agreement also provided that Continental Finance could modify the agreement in its sole discretion by giving notice of the modification to the plaintiffs and by the plaintiffs' continued use of the credit cards after notice. Each agreement stated specifically:

> We can change any term of this Agreement, including the rate at which or manner in which INTEREST CHARGES, Fees, and Other Charges are calculated, in our sole discretion, upon such *notice to you* as is required by law.

(Emphasis added). Finally, each agreement provided that the plaintiff could terminate the agreement and close the account "at any time by notifying [Continental Finance] by telephone or in writing" if the plaintiff did not assent to the change.

This contractual structure is consistent with the general contractual structure employed in the credit card industry and, more importantly, is consistent with general contract law, including Maryland law, for the formation of contracts and modifications of them. Those well established contract principles provide that when one party to an existing contract unilaterally gives notice of a modification to the other party, the modification

24

becomes binding on the other party by receipt of the notice of modification and that party's assent. Assent may be communicated explicitly or may be implied by conduct, such as the continued use of the credit card after receiving the notice. Thus, if a credit card company purports to make a change to the credit card agreement but fails to provide the credit card holder with notice, the change is not binding, as the credit card holder did not agree and therefore the change would be illusory.

These contract principles are well recognized in Maryland as set forth in *DirectTV, Inc. v. Mattingly*, 829 A.2d 626 (Md. 2003), where DirectTV agreed to provide written notice of any changes to its customer agreement with the plaintiff, Mattingly. *Id.* at 634. But because DirectTV failed to provide Mattingly with such notice, the court concluded that DirectTV's purported change to the credit card agreement was ineffective. The court explained that because Mattingly "was not given proper notice of the changes to his initial customer agreement with [DirectTV], [he] could not have constructively assented to the arbitration provision." *Id.* at 635. Thus, without such assent, "the terms of the initial customer agreement," which lacked an arbitration provision, controlled. *Id.* at 635. Both in *DirectTV* and other cases, the Maryland Supreme Court confirms these well established contract principles that to modify an existing contract, one party must give the other party notice of the modification, and the other party must assent to it by explicit communication or by conduct. *See id.* at 635–36; *see also Holloman v. Circuit City Stores, Inc.*, 894 A.2d 547, 554 (Md. 2006) (rejecting the argument that Circuit City's ability to modify the arbitration agreement without the plaintiff's consent rendered the promise to arbitrate illusory); *Cheek v. United Healthcare of Mid-Atlantic, Inc.*, 835 A.2d 656, 662 (Md. 2003)

(holding that "the fact that United HealthCare reserves the right to alter, amend, modify or revoke the Arbitration Policy at its sole and absolute discretion at any time *with or without notice* creates no real promise, and therefore, insufficient consideration to support an enforceable agreement to arbitrate" (emphasis added) (cleaned up)); *Naimoli v. Pro-Football, Inc.*, 120 F.4th 380, 389 (4th Cir. 2024) (recognizing that under Maryland law to create an online agreement with a ticket purchaser, the football team had to give "actual or constructive notice" of the terms and conditions of the agreement and the ticket purchaser had to "assent" to those terms and conditions (first citing *DirectTV*, 829 A.2d at 635; and then citing *Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 88–89 (4th Cir. 2016))); *cf. Marshall v. Georgetown Mem'l Hospital*, 112 F.4th 211, 218 (4th Cir. 2024) (noting that the plaintiff "had reasonable notice of an offer to enter into an arbitration agreement, and . . . manifested her assent to that agreement" to form a contract under similar South Carolina state contract principles).

In *Holloman*, the Maryland Supreme Court distinguished *Cheek* by noting the absence in *Cheek* of notice and consent. Whereas United Healthcare in *Cheek* had "unfettered discretion to alter or rescind the arbitration agreement without notice or consent," Circuit City in *Holloman* had to "provide thirty-days notice prior to any modification and [could] only alter the agreement on a single day out of the year to become effective during the next day." 894 A.2d at 554. The *Holloman* court reiterated that United Healthcare's promise to arbitrate in *Cheek* was illusory because it "retained the right to 'alter, amend, modify, or revoke the Employment Arbitration Policy at its sole and absolute

discretion at *any time with or without notice*' and without consent," rendering the agreement "unenforceable for lack of consideration." *Id.* at 553 (cleaned up).

Thus, essential under Maryland law — and contract law generally — to the enforcement of a modification are the requirements that the company give the customer notice of a change and that the customer manifest assent to the change. *See DirectTV*, 829 A.2d at 636–37.

In this case, any potential modification by Continental Finance could become binding on the plaintiffs only so long as Continental Finance gave notice of the modification to the plaintiffs and the plaintiffs assented to it by continuing to use their credit cards. Both requirements are questions of fact. *See Univ. Nat'l Bank v. Wolfe*, 369 A.2d 570, 576 (Md. 1977) (noting that "whether subsequent conduct of the parties amounts to a modification or waiver of their contract is generally a question of fact to be decided by the trier of fact"). The agreement here, however, provided that Continental would provide the plaintiffs with notice of a change and that the plaintiffs could choose not to assent to it by terminating the agreement simply with a telephone call. The contractual structure is thus not only consistent with Maryland law but is the established industry structure for modifying credit card agreements.

Nonetheless, the majority opinion remarkably strikes down this legal and widespread commercial arrangement, concluding that somehow the notice and assent arrangement here is "illusory." To do so, it relies almost exclusively on *Cheek*, finding that case "indistinguishable." Not only does *Cheek* not support the majority's conclusion, it explicitly rejects it.

27

In *Cheek*, an agreement between an employer and its employee "reserved [to the employer] the right to, within its sole discretion, alter, amend, modify, or revoke the arbitration agreement at any time and *without notice*." 835 A.2d at 657 (emphasis added). The court concluded that because the change could be effected "at any time with or without notice" it "creates no real promise, and therefore, insufficient consideration to support an enforceable agreement to arbitrate." *Id.* at 662. The court held such a unilateral change to be "entirely illusory, and therefore, no real promise at all," because United claimed the right to modify the agreement "at any time with or *without notice and without consent*." *Id.* at 662–63 (emphasis added) (cleaned up). In reaching its conclusion, however, the *Cheek* court recognized the universal contract law that allows *notice and consent* to form a binding contract. *See id.* at 661–62.

It is also noteworthy that in *Cheek*, the court relied for its holding only on cases from other jurisdictions in which *no notice or consent* was required. For instance, it cited *Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306, 310 (6th Cir. 2000), noting that in that case, the company "reserved the right to alter the applicable rules and procedures of arbitration *without any notification to or consent from the appellants*." *Cheek*, 835 A.2d at 662–63. And in *Penn v. Ryan's Family Steak Houses, Inc.*, 269 F.3d 753 (7th Cir. 2001), the court construed similar language and reached the same conclusion. Thus, the key to the *Cheek* court's holding was the fact that the employer could make the change *without notice and consent*. The *Holloman* court reemphasized the importance of this element.

In *Holloman*, the Maryland Supreme Court observed that in *Cheek* it had "determined that because United retained the right to alter, amend, modify, or revoke the

28

Employment Arbitration Policy at its sole and absolute discretion at *any time with or without notice* and *without consent* . . . the agreement was unenforceable for lack of consideration." 894 A.2d at 553 (second emphasis added) (cleaned up). But the *Holloman* court then noted that under the facts before it, the agreement did indeed provide for notice such that the recipient of the notice would have an opportunity to disagree with the modification, thus making the arrangement an enforceable contract under established Maryland law.

At bottom, I conclude that the majority's holding is inconsistent with Maryland law and undermines the universal practice of allowing credit card companies to make changes so long as they provide credit card holders with notice and the opportunity to accept or reject the changes by either continuing to use the credit card or withdrawing from the arrangement.

I concur in Parts II and III.A. and respectfully dissent from Part III.B.